## Flanagan, Appellant, *v.* People's Pass. Ry. Co.

*Negligence—Street railways—Infant.*

In an action against a street railway company to recover damages for the death of a girl about seven and a half years of age, it appeared that the only witness to the accident was a boy about ten years old. He testified that it was somewhat dark, but that he saw the car by its lights, and as it came along the little girl who had been standing on the pavement started to run across the street diagonally in front of the car, not at a crossing. The driver called out to her "hey, there," but she answered "never mind, I can get apast." The boy testified that the car was going fast, but he did not say that it was faster than usual. He stated that the car slid two feet after the child was run over, but the evidence was uncertain as to what part of the car passed over the child. *Held* that a nonsuit was properly entered.

Argued April 4, 1894. Appeal, No. 306, Jan. T., 1894, by plaintiff, from judgment of C. P. No. 3, Phila. Co., March T., 1893, No. 735, entering compulsory nonsuit. Before STERRETT, C. J., GREEN, WILLIAMS, MITCHELL, DEAN and FELL, JJ. Affirmed.

Trespass for death of daughter. Before FINLETTER, P. J.

At the trial it appeared that, on April 22, 1893, Mary Flanagan, aged seven and one half years, was killed by one of defendant's cars on Fourth street, in the city of Philadelphia, just below its intersection with Borden street. The accident happened between half past seven and eight o'clock in the evening when it was somewhat dark. The only witness of the accident was a boy ten years old who described the occurrence as follows:

"Q. What did you see of this accident—did you see the car that was coming along? A. Yes, sir. Q. Just tell us what you saw—how was the car running? A. The car was coming fast. Q. How fast? A. Well, the horses were going as fast as they could. Q. Now go ahead and tell your story. A. Mary Flanagan was on the same corner I was, and she says, 'Hello, Willie,' and I says, 'Hello, Mary,' and she went to run across and the car was coming down fast. The driver said, 'Hey, there,' and the horses didn't stop, and the little girl said, 'Never mind, I can get apast,' and she run apast, and with that the horses kicked her. Q. She started to run across and the driver says, 'Hey, there,' and she says, 'Never mind; I can get past,' and then it happened? A. She went to get past and the horses kicked her. Q. Well? A. With that a man carried her home—took her from underneath the horses' feet, and I went and picked up her hat and brought it home. Q. How far in front of the cars was it that she said, 'Never mind that; I can get across?' A. Well, about five or six doors. Q. In front of the car? You understand what I mean. When she said, 'Never mind; I can get across,' she was five or six doors in front of the car? A. Yes, sir. Q. Had the car stopped at Borden street? A. No, sir. Q. You are sure of that, are you? A. Yes, sir. Q. When the driver was five or six doors back of her he said what? A. He said, 'Hey, there.' Q. Did he stop then? A. No, sir. Q. He went right on? A. Yes, sir.

Q. Did he try to slow up his horses? A. No, sir. Q. And then the horses came along and kicked her and knocked her down? A. Yes, sir. Q. Did you hear the driver give her any warning outside of saying to her 'Hey, there?' A. No, sir. Q. Was there anything said by Mary besides 'Never mind?' A. Yes, sir. Q. What did she say? A. She said, 'Never mind; I can get apast,' and she went to get apast and the horses kicked her. Q. Who did she say that to? A. To the driver. Q. And the driver went right on? A. Yes, sir. Q. How much of the horses passed over her, and the car? A. I could not tell you. I forget. It was dark; I could not see. Q. It was pretty dark, was it? A. Yes, sir; about seven or eight o'clock. Q. When she started to run across Fourth street from the other side, which direction did she take? A. She took from the corner, and she went right over this way. (Indicating.) Q. Do you mean that she went right straight across or that she went towards the south? A. She went cat-a-cornered. Q. When the car was within five or six doors of her, where was she? A. She was on the pavement. Q. I asked you before when it was that the driver said, 'Hey, there,' how far back the car was, and you said it was five or six doors back of her then? A. Yes, sir. Q. How do you mean, that she was on the pavement when he said, 'Hey, there?' A. She was going to go across. Q. She was just starting to go across? A. Yes, sir. Q. So the driver saw her when he was five or six doors back of her? A. Yes, sir. Q. And she said, 'Never mind; I can get across?' A. Yes, sir. Q. And she was going in a cat-a-cornered direction across the street, ahead of the car? A. Yes, sir."

Cross-examination, by Mr. Prichard: ". . . Q. It was pretty dark, was it not? A. Yes, sir. Q. You could see the car, could you, plainly? A. I could see the light. Q. You could not see the car nor the people on it? A. No, sir. Q. I understand you to say that Mary Flanagan spoke to the driver? A. Yes, sir; she said, 'Never mind; I can get apast.' Q. Did she say that to the driver? A. Yes, sir. Q. She said that to you, didn't she? A. No; the driver was coming along and he said, 'Hey, there,' and she said, 'Never mind; I can get apast,' to the driver. Q. How close was the car when the driver said 'Hey, there?' A. It was below Borden street.

Q. Had it crossed Borden street?   A. Yes, sir.   Q. So, as I understand you, the car coming down Fourth had crossed Borden street and the driver said, 'Hey, there,' and she said, 'Never mind; I can get across,' and ran across?   A. Yes, sir. Q. And what struck her, or which horse kicked her? I suppose you could not say?   A. No, sir.   By Mr. Eyre: Q. After the driver said, 'Hey, there,' did he slow up or continue driving fast?   A. He went right on.   By Mr. Prichard: Q. It all happened very rapidly?   He said, 'Hey, there,' and she said, 'Never mind; I can get across,' and she went right on? A. Yes, sir.   Q. The car stopped very suddenly there, didn't it?   A. After the horse kicked her.   Q. Did it stop at once or did it go on?   A. No, sir.   By Mr. Eyre: Q. How far did it slide before it stopped?   A. It slid enough to go right over her arm.   Q. It slid far enough to go over her arm?   A. Yes, sir.   Q. The horses passed over her?   A. Yes, sir,   Q. How about the front truck, can you say?   A. No, sir.   Q. You could not say whether the front truck passed over her or not? A. No, sir.   Q. You know how long a foot is.   About how many feet did the car slide before it stopped?   A. About two feet."

No other witnesses were called who described the accident or the speed of the car.

The court entered a compulsory nonsuit and subsequently refused to take it off.

*Error assigned* was refusal to take off nonsuit.

*Lincoln L. Eyre, B. F. Hughes* with him, for appellant, cited: Ry. v. Steinhart, 2 Penny. 358; Ry. v. Mulhair, 6 W. N. 508; Ry. v. Middleton, 3 W. N. 486; Gilmore v. Ry., 153 Pa. 31; Gibbons v. Ry., 155 Pa. 279; Ehrisman v. Ry., 150 Pa. 180; Bucklin v. Davidson, 155 Pa. 362; Schmidt v. McGill, 120 Pa. 405; R. R. v. McKeen, 90 Pa. 122.

*Frank P. Prichard, John G. Johnson* with him, for appellee, cited: Chilton v. Traction Co., 152 Pa. 425.

OPINION BY MR. JUSTICE MITCHELL, July 12, 1894:

There was only one witness of the accident, a boy of ten

years, but his account gives us the main facts with entire clearness. Between seven and eight o'clock on the evening of April 22, 1893, the deceased, a girl of about seven and a half years, was standing on the pavement of Fourth street a short distance below Borden. It was somewhat dark, so that persons could not be seen plainly, but the boy testified that he saw the car by its lights, and as it came along the little girl started to run across Fourth street diagonally in front of it. The driver called out to her " hey, there," but she answered " never mind, I can get apast," and ran on and was knocked down and injured by the car. It would have been a perfectly clear case of contributory negligence had the deceased been a grown person. Being a child such negligence is not chargeable to her, but the facts have a bearing on the question of the negligence of defendants. The only negligence attributed to them is the speed of the car, and the failure of the driver to stop when he saw the child.

In regard to speed the only evidence is the testimony of the boy that the car was coming fast. He was not asked nor did he say that it was faster than usual. The attempt to deduce unusual speed from the distance the car ran after striking the child must fail from the uncertainty of the evidence as to what part of the car passed over her and the direct testimony of the boy that it only slid two feet.

As to the duty of the driver to stop, it must be remembered that he had passed the crossing at Borden street where he was bound to expect and therefore to keep a special watch for foot passengers, and the little girl was still on the pavement, though about to step into the street, when he gave her the warning. He had a right to suppose it would be sufficient. The circumstances show that he was paying attention to his business, and using his judgment in the way the situation seemed to require. The result proved that it would have been better to have stopped or checked the car at first, but wisdom after the event is easy, and looking only at the facts as they appeared to the driver then, the jury would not be justified in saying that he ought to have foreseen the necessity of stopping. The learned judge was right in holding that there was no sufficient evidence of defendant's negligence.

Judgment affirmed.